UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KATHERINE L. TSOULAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 04-193-B-W |
| | ) | |
| LIBERTY LIFE ASSURANCE | ) | |
| COMPANY OF BOSTON, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER ON MOTION FOR JUDGMENT
ON STIPULATED RECORD

Afflicted with multiple sclerosis (MS), Plaintiff Katherine L. Tsoulas challenges Defendant Liberty Life Assurance Company of Boston's (Liberty) termination of her long-term disability benefits. Because Liberty's termination was supported by substantial evidence, this Court GRANTS Defendant's Motion for Judgment on Stipulated Record (Docket #10).

I.      FACTUAL BACKGROUND

A.  The Plaintiff's Claim

This case arises out of Liberty's termination of Ms. Tsoulas's long-term disability benefits under an insurance policy issued to her former employer Medaphis Corporation (Medaphis). Ms. Tsoulas filed suit in Maine Superior Court, Penobscot County, under 29 U.S.C. § 1132(a)(1)(B),[1] the civil enforcement section of the Employee Retirement Income Security Act of 1974 (ERISA), alleging wrongful termination of long-term disability benefits payable under Liberty's policy. *See Compl.* (Docket # 1, Attach. # 1). Pursuant to 28 U.S.C. §§ 1441 and 1446, Liberty removed the action to this Court on November 8, 2004. *See Not. of Rem.* (Docket # 1).

---

[1] Ms. Tsoulas also seeks attorney fees and costs under 29 U.S.C. § 1132(g)(1).

**B. Submission on a Stipulated Record**

The parties have submitted this case for judgment on a stipulated record. *See* Docket # 10, 12, 16. "[T]o stipulate a record for decision allows the judge to decide any significant issues of material fact that he discovers . . . ." *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 11-12 (1st Cir. 1985); *see also Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 31 (1st Cir. 2000), *cert. denied*, 531 U.S. 1014 (2000).

**C. September 29, 1998 – March 31, 2004:  Disability Benefit History**

Beginning February 1998, Ms. Tsoulas became employed at Medaphis as a Manager of Educational Services, a position she held until she removed herself on September 29, 1998. D31, D71.[2]  By virtue of her employment, Ms. Tsoulas was insured under a Liberty group disability policy. D1-30.  Claiming she was unable to work due to MS, Ms. Tsoulas immediately applied for and received short-term disability benefits and in March 1999, she applied for and initially received long-term disability benefits. *Id.*  She continued to receive long-term disability benefits until Liberty discontinued them on March 31, 2004.  D164-67.

**D. April 1998 – August 2002:  Medical History**

In April 1998, Dr. Kathryn Isaac, a staff physician in the Department of Neurosciences at the Stanford University Medical Center, performed the first neurological evaluation of Ms. Tsoulas.  D439.  Dr. Isaac's history revealed that Ms. Tsoulas experienced seizures in 1994 or 1995, and that she had been admitted to the Stanford University Medical Center on April 28, 1998, due to "worsening tremors" and black outs.  *Id.*  According to Dr. Isaac, a 1995 EEG demonstrated her recurring seizures were non-epileptic, but she had multiple other symptoms including "numbness down the right leg and arm" and "fatigue."  *Id.*  Dr. Isaac reported that Ms.

---

[2] References to the record refer to the stipulated record filed with the Court on March 22, 2005.  The record contains pages D1 through D838 and two compact discs containing surveillance video footage marked as D839 and D840.

Tsoulas's tremor "appears to be psychogenic" and that she "will clearly need psychiatric consultation as well." *Id.*

On May 7, 1998, Dr. Isaac summarized Ms. Tsoulas's symptoms including "episodic tremors, dysarthia, fatigue, and ataxic gait, which she describes having off and on for the past three years". D447. Ms. Tsoulas also reported fainting and stuttering. *Id.* Brain MRIs in 1995 and 1997 exhibited two to three white matter lesions of unclear etiology; Dr. Isaac reviewed the MRIs with a neuro-radiologist, who concluded the lesions were "not completely typical for multiple sclerosis." *Id.* Dr. Isaac wrote that she did not believe "that she has had symptoms that are consistent with a diagnosis of multiple sclerosis." *Id.* Ms. Tsoulas requested an appointment with Dr. Leslie Dorfman, Professor of Neurology and Director of the MS Clinic at the Stanford University Medical Center. D448.

Dr. Dorfman saw Ms. Tsoulas on May 22, 1998. After taking a history, reviewing the most recent MRI scan, and performing an examination, Dr. Dorfman concluded: "Although the diagnosis is not completely certain, I think it is likely on the basis of the clinical history and the MRI findings that this woman has relatively mild multiple sclerosis, relapsing-remitting form." D406. In addition, Dr. Dorfman determined that Ms. Tsoulas was "suffering from an anxiety disorder, and that some of the symptoms which are currently most troublesome to her are related to this, rather than to her MS." *Id.* Dr. Dorfman's recommended treatment included active follow-up by a neurologist for MS, potential use of corticosteroids for MS exacerbations, and "ongoing concurrent treatment for her anxiety disorder." D407.

In September 1998, Ms. Tsoulas saw Dr. Annette Langer-Gould, Acting Director of Stanford University Medical Center's MS Clinic.[3] D454. Dr. Langer-Gould's September 28,

---

[3] Dr. Dorfman was going on sabbatical leave for one year and she, therefore, referred Ms. Tsoulas to Dr. Langer-Gould. D407.

1998 note states:  "She is seen today on an emergency basis because she would like disability since she feels that she has been having an exacerbation for the last five weeks."  *Id.*  At that time, she reported experiencing "severe fatigue, nausea, slowed mentation, slowed and stuttering repetitive speech, worsening ataxia with several falls, abdominal cramping, fevers up to 105 degrees . . ., severe stiffness, [and] frequent frontal occipital headaches . . . ."  *Id.*

Dr. Langer-Gould's examination revealed that Ms. Tsoulas was mentally "alert, very anxious, and hostile."  *Id.*  She noted that Ms. Tsoulas had "fine motor coordination in the upper and lower extremities," although her gait was "wide-based with stiff legs" and she was "unable to tandem."  *Id.*  Dr. Langer-Gould summarized:

> I had a lengthy discussion with her and her friend.  I explained that although she clearly has multiple sclerosis, she also has a psychiatric condition for which she needs to continue seeking treatment.  Initially she refused to do this and her [sic] and her friend vehemently denied that she had any psychological problems.  I reminded her of her admission to the Stanford Epilepsy Center for her pseudoseizures and informed her that since I am not a licensed psychotherapist, I cannot offer appropriate treatment for these problems.

*Id.*  Dr. Langer-Gould wrote that "[a]lthough her gait may be slightly worse, it is very difficult for me to tell since she embellishes her physical examination."  *Id.*  Dr. Langer-Gould completed Ms. Tsoulas's disability documentation for one month and wrote that she would reassess her "continued need for disability" then.  *Id.*

On October 26, 1998, Ms. Tsoulas followed up with Dr. Langer-Gould.  Dr. Langer-Gould found that, since her September 1998 visit, she "has improved somewhat," although she continued to complain of "fevers, urinary urgency, difficulty processing information, and says she is weaker than ever." D485.  Dr. Langer-Gould concluded that Ms. Tsoulas was suffering from MS and a conversion disorder.[4]  D399.  Although Dr. Langer-Gould reported that Ms.

---

[4]  A conversion disorder involves symptoms affecting voluntary motor or sensory functions that suggest a neurological disorder, yet no neurological explanation exists.   http://www.emedicine.com/med/topic1150.htm.

4

Tsoulas was "clearly . . . under tremendous psychological stress," she told Ms. Tsoulas it was appropriate for her to return to work on a part-time basis. D485. Ms. Tsoulas responded that she had discussed the possibility of part-time work with her employer and it was not an option. *Id.* Dr. Langer-Gould completed Ms. Tsoulas's disability documentation for another month. *Id.*

Based on her physicians' recommendations, Ms. Tsoulas saw Joyce Brothers Kart, M.F.C.C., for psychotherapy on four occasions beginning in January 1999 and ending in March 1999. D614. On March 17, 1999, Ms. Kart reported:

> There has been a great deterioration in her functioning over the last year to the point where she is unable to predict her ability to function physically and emotionally. In my consultation with Dr. Annette Langer at Stanford Hospital the diagnosis at this point seems to be a combination of multiple sclerosis and an underlying anxiety disorder. A large part of the frustration for Katherine has been the difficulty in getting a diagnosis that fits her symptoms of extreme fatigue, dramatic shaking, trembling and stuttering.
>
> It has been extremely difficult for her to function normally to the point where she has sent her 12 year old son to live with his father and has been forced to give up what was a very active job search. She lost her last job due to downsizing, but had missed several months of work due to her medical condition. It is very unclear when she will be able to resume active employment due to her symptoms.

*Id.* Ms. Kart's assessment included "Anxiety Disorder NOS; Adjustment Disorder with Depression and Anxiety." *Id.* There is no evidence Ms. Kart or any other mental health professional has evaluated Ms. Tsoulas since March 5, 1999.

In July 1999, Ms. Tsoulas underwent a neurological consultation with Dr. Cathleen Miller of the Neurology Medical Group of Santa Cruz. D730-33. Upon examination, Dr. Miller noted that Ms. Tsoulas was "alert and attentive with normal speech and language, and no gross cognitive deficits. She would occasionally stutter." *Id.* She had "an intermittent irregular tremor that primarily involves the right upper extremity as well as both lower extremities." D732. She

---

"Conversion symptoms suggest a physical disorder but are the result of psychological factors." *Id.* Symptoms may include weakness, gait disturbances, sensory symptoms, visual symptoms, and pseudoseizures. http://www.emedicine.com/emerg/topic112.htm.

also reported that despite the existence of the tremor, Ms. Tsoulas's "fine-finger movements, rapid alternating movements, finger-nose-finger, and heel-knee-shin maneuver" were normal. *Id.*

Dr. Miller concluded that Ms. Tsoulas had "relapsing/remitting multiple sclerosis beginning with the prolonged episode of vertigo in 1994." *Id.* Ms. Tsoulas's self-reported symptoms included "episodic worsening of her tremulousness associated with heightened anxiety and bowel incontinence as well as fatigue and impaired balance." *Id.* Dr. Miller noted that "her current tremor is difficult to characterize, and there is a degree of embellishment noted on examination today." *Id.* Nevertheless, Dr. Miller wrote to her primary care physician, Dr. Finder, that she had asked Ms. Tsoulas "to address her ongoing disability status with you, but I do agree that she is greatly disabled at this time of our first meeting." D733.

On October 18, 1999, Liberty sent Dr. Finder a questionnaire seeking information regarding Ms. Tsoulas's disability. D619-21. Dr. Finder reported Ms. Tsoulas's primary diagnosis was MS and she was never expected to regain either full or modified function. D619-20. Dr. Finder noted that Ms. Tsoulas was reporting symptoms of muscle pain, dizziness, bowel dysfunction, weakness, cognitive deficits, numbness in her right leg, fatigue, visual problems, tremors, speech difficulties, and gait disturbances. D619.

On February 9, 2001, Liberty sent a nurse, Christine Entrekin, to conduct a home visit with Ms. Tsoulas to assess her ongoing disability. D380-81. Ms. Entrekin reported that Ms. Tsoulas used a walker and complained of fatigue and memory problems. D381. She noted that Ms. Tsoulas was "going out only once a week and apparently that has decreased due to appearance of seizures which clmt describes as frequent grand mal." *Id.* Ms. Entrekin concluded

that Ms. Tsoulas was "significantly impaired due to physical limitations as well as clmt own assertions of deteriorating mental status. Prognosis for recovery does not appear favorable." *Id.*

Ms. Tsoulas established chiropractic care with Dr. Deborah Baker in August 2001 and continued to receive chiropractic care on an ongoing basis. D345. Dr. Baker completed a Functional Capacities Form on August 22, 2002, stating that Ms. Tsoulas had MS with a seizure disorder and her altered gait made ambulation difficult. *Id.* While Dr. Baker placed some restrictions on Ms. Tsoulas,[5] the only complete restriction was against lifting forty or more pounds. *Id.*

Dr. Susan O'Connor, a surgeon,[6] saw Mr. Tsoulas upon referral in October 2001 in connection with a palpable abnormality of her left breast. D183-84. Dr. O'Connor removed the abnormality on October 26, 2001 and the diagnosis of breast cancer was confirmed. D182-83. Ms. Tsoulas had at least three post-operative checkups with Dr. O'Connor between November 2001 and August 2002. D182-83. After the final checkup on August 21, 2002, Dr. O'Connor reported that Ms. Tsoulas no longer had any physical restrictions in connection with her breast cancer diagnosis. D182.

### E. February 2004 – March 2004:  Activities Questionnaire, Liberty's Surveillance of Ms. Tsoulas, and Dr. Holbrook's Report

As part of its ongoing review of Ms. Tsoulas's claim for continued long-term disability benefits, Liberty began to conduct surveillance in January 2004. D38, D248-59, D480. Byers Confidential Investigations (BCI) conducted the first surveillance on five consecutive days from February 10, 2004 to February 14, 2004. D248-59, D840. On February 12, 2004, while BCI's

---

[5] Dr. Baker placed some restrictions on Ms. Tsoulas's ability to reach, grasp, pull, push, climb, kneel, bend, squat, walk, stand, conduct repetitive motions, and lift between ten and forty pounds. D345.

[6] Ms. Tsoulas incorrectly identifies Dr. Susan O'Connor as an oncologist. She is not. She is a general surgeon. Another physician referenced in the record, Dr. Merrill Garrett, was Ms. Tsoulas's oncologist.

surveillance was ongoing, Ms. Tsoulas submitted to Liberty the following responses to a routine

Activities Questionnaire:

1. *How long are you able to sit?*

   Zero to one hour.

2. *How long are you able to stand?*

   Very little.

3. *How long are you able to walk?*

   Zero.

4. *How many hours a day do you sit?*

   Most.

5. *How many hours a day do you stand?*

   Zero.

6. *How many hours a day do you walk?*

   Zero.

7. *How many hours a day do you spend in bed?*

   Fourteen to eighteen.

8. *Do you require any assistive devices?*

   Yes, a cane, wheelchair and scooter.

9. *How long are you able to drive a car?*

   Very little.

10. *How do you maintain contact with people or activities that matter most to you?*

    Phone or email.

11. *How many times a day do you leave the house during the week?*

Zero to one.

*12. How many times a day do you leave the house on the weekends?*

Zero.

*13. How often do you go shopping at the mall?*

Never.

*14. How often do you get outdoors?*

Summers and fall.

*15. How do you accomplish grocery shopping?*

Family.

*16. How do you accomplish carrying groceries into the house?*

Son.

*17. How do you accomplish going up and down stairs?*

Can't.

*18. How often do you travel or take vacation?*

Rarely.

*19. Where do you go on vacation?*

Family.

*20. Describe in your own words, what prevents you from performing your own occupation.*

M.S., exhaustion, immobility, low vitality.

*21. Please describe your daily routine.*

Shower, meals, rest, emails, t.v.

D231-33.

The surveillance showed Ms. Tsoulas performing activities that can be viewed as contrary to her self-reported limitations. Specifically, BCI's surveillance revealed that on February 11, 2004, Ms. Tsoulas (1) drove her car unassisted; (2) walked without the aid of a cane, wheelchair, or scooter; (3) completed errands by herself and without any assistive devices; (4) walked up and down a few steps; (5) conducted banking activities without any assistance; (6) shopped at the mall and the video store; and, (7) went grocery shopping, pushed a grocery cart, and loaded and unloaded groceries. D250-54, D840.

Based upon Ms. Tsoulas's February Activities Questionnaire and BCI's surveillance, Liberty determined additional surveillance was necessary and a complete review of Ms. Tsoulas's file should be conducted by a consulting physician. D37-38. Liberty hired Omega Insurance Services (Omega), which conducted surveillance from March 10, 2004 to March 14, 2004. D37, D189-223, D839. Omega's report, some of which was corroborated by the video surveillance, revealed:

> During surveillance conducted on . . . March 11, 2004, . . . [t]he claimant was observed driving . . . and traveling to a tanning salon, a bank, a donut shop, a nail salon, and back to her residence. The claimant was videotaped walking, driving, entering and exiting the vehicle, ascending stairs, and entering and exiting various establishments. The claimant moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction. No visible braces, supports, or orthopedic devices were observed.

> During surveillance conducted on Friday, March 12, 2004, . . . the claimant was observed riding as a passenger in a . . . Subaru Forester . . . and traveling to a hotel, a parking garage, a restaurant, a comedy club, a night club, and back to the hotel. The claimant was videotaped walking, entering and exiting the vehicle, entering and exiting various establishments, . . . smoking from a pipe, and consuming alcoholic beverages. The claimant moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction. No visible braces, supports, or orthopedic devices were observed.

> During surveillance conducted on Saturday, March 13, 2004, . . . [t]he claimant was observed riding as a passenger in the . . . Subaru Forester . . . and traveling to a mall and back to the hotel. The claimant was videotaped walking,

sitting, standing, bending at the waist, signing autographs at the mall, entering and exiting the vehicle, entering and exiting various establishments, and conversing with various unidentified subjects.  The claimant moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction.  No visible braces, supports, or orthopedic devices were observed.

During surveillance conducted on Sunday, March 14, 2004, . . . [t]he claimant travel[ed] to a restaurant, a furniture store, various gift shops, a coffee shop, and a residence.  The claimant was videotaped walking, entering and exiting the vehicle, entering and exiting various establishments, and conversing with an unidentified white male subject.  The claimant moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction.  No visible braces, supports, or orthopedic devices were observed.

D191-92.

After Omega's surveillance, Liberty referred Ms. Tsoulas's file to John Holbrook, M.A.,

M.D., F.A.C.E.P.   D36-37, D179-89.   In his report dated March 27, 2004, Dr. Holbrook

concluded:

- The diagnosis of multiple sclerosis has not been conclusively established.
- Multiple clinicians have included [sic] in the past that the majority of the claimant's symptoms have a psychological basis; the diagnosis of a conversion disorder has been assigned to the claimant.
- The claimant's most recent APS [Dr. O'Connor, 8/21/2002] opined that the claimant had no physical restrictions.
- There is a significant contradiction between the claimant's reported physical limitations and her functional capacity as evidenced on surveillance.
- In conclusion, the clinical file indicates that the claimant may have undergone a period of psychological stress in 1998 and 1999 [as well as prior], that was diagnosed by clinicians as a conversion disorder with a psychological basis.
- Recent evidence, both medical and nonmedical, suggest that she has recovered sufficient functional capacity [to be] capable of at least full-time light work.

D179.

Dr. Holbrook wrote that Ms. Tsoulas's MRI abnormalities were "consistent with, but not

diagnostic of MS." D180.   He commented that "over the prolonged period of observation by

imaging, the claimant's MRI findings would be atypical of a presentation of MS."   *Id.*   Dr.

Holbrook further stated that "the claimant's 'attacks' have been repeatedly characterized as more

consistent with a conversion reaction and having a psychological basis, and are therefore discounted as criteria supportive of MS." *Id.*  Dr. Holbrook also opined that Ms. Tsoulas's seizures "have been proven by electrodiagnostic study to be nonepileptic, further supporting a finding of a psychological basis for the claimant's symptoms." *Id.*

Dr. Holbrook reviewed the surveillance information and reported that "recent observations of the claimant's activities of daily living indicate that the claimant has regained sufficient functional capacity for at least full-time light work." *Id.*   He also pointed out that "no impairment on a psychiatric basis is currently claimed by either the claimant or her physicians." *Id.*  Dr. Holbrook went on to state that:

> There is a dramatic inconsistency bordering on contradiction between the claimant's report of her inability to walk, her physical therapist's report in January 2004 that she spends six hours per day [on] a motorized scooter, and Dr. Arabakjis' report that the claimant cannot ambulate household distances, and the evidence of the claimant's physical functional capacity that was indicated on surveillance noted below.  Given the fact that the majority of the claimant's symptoms are either self-reported, unwitnessed, or unable to be objectively validated, it is reasonable to use the evidence of surveillance as an estimate of the claimant's physical functional capacity, and to conclude that she does retain functional capacity sufficient for full-time work.

D181.

**F.  March 31, 2004:  Liberty Terminates Long-Term Disability Benefits**

On March 30, 2004, Liberty wrote to Ms. Tsoulas terminating her long-term disability benefits effective March 31, 2004.  D164-67.  Based on the purported contradiction between Ms. Tsoulas's self-reported physical limitations and the surveillance, together with Dr. Holbrook's March 27, 2004 report, Liberty concluded that Ms. Tsoulas did not meet the definition of disability as defined in the Medaphis policy.  The letter explained:

> You submitted an Activities Questionnaire dated February 12, 2004.  On your questionnaire, you made the following assertions:  You are able to stand 'very little', are not able to walk at all, and are unable to climb stairs.  You

12

indicated that you require a cane, a wheelchair and scooter, and are able to drive 'very little.' You noted that you only leave your house during the Summer and Fall seasons. You indicated that you are unable to perform your own occupation due to exhaustion and immobility. You also indicated that you have memory or concentration difficulties.

We received a copy of a prescription for a scooter, dated January 29, 2004, from the Eastern Maine Medical Center Physical Therapy Department. On this prescription, it was stated that you are able to 'take a few steps with a cane but very ataxic, can not ambulate household distances', and that you would spend 'approximately six hours per day' in the scooter. The prescription summarized that you are 'no longer safely ambulating even for household distances.' And that you are 'unable to propel a manual wheelchair of any type due to weakness and muscle fatigue.'

It was noted that on the first and third Monday of January, 2004, you facilitated a program with the National Multiple Sclerosis Society called 'Game Time'. In addition, you appeared in the January 11, 2004 edition of the Portsmouth Herald in an article entitled 'The Real Calendar Girls'. You were photographed standing unaided by a cane. You wrote and submitted an article to the National MS Society website recommending naturopathic products.

Based upon the inconsistencies noted between your self-reported activities and abilities, and those noted above, surveillance was initiated.

On Tuesday, February 10, 2004, you were observed as you left your residence driving your vehicle. You were observed standing, walking, pushing a shopping cart and placing plastic grocery bags into your vehicle. No visible braces, supports or assistive devices were observed.

On March 11, 2004, you were observed driving from your residence, and going to a tanning salon, bank and nail salon. You were observed climbing stairs, and used no visible braces, supports or assistive devices.

On March 12, 2004, you were observed as you traveled to Portland, Maine, arriving at The Eastland Park Hotel. You retrieved a suitcase from the rear of the vehicle and pulled the suitcase into the hotel. At 6:46 pm you left the hotel and you were observed as you visited various establishments, returning to the hotel at approximately 1:43am. During this time, you were observed to use no visible braces, supports or assistive devices.

On March 13, 2004, you went to the Maine Mall, where you were observed signing autographs on calendars for approximately one hour and twenty-one minutes. During this time, you were observed sitting, standing, and bending at the waist with no visible braces, supports or assistive devices.

On March 14, 2004, you were observed exiting the hotel at 12:11 pm, and visiting several establishments, until 5:00 pm, when you departed Portland. Again, no visible braces, supports or assistive devices were observed.

Your file was then referred to a Liberty Mutual Consulting Physician [Dr. Holbrook] for review.  In his report, [Dr. Holbrook] makes the following statements, "The diagnosis of multiple sclerosis has not been conclusively established."  And, "There is a significant contradiction between the claimant's reported physical limitations and her functional capacity as evidenced on surveillance."  He also notes, ". . . the clinical file indicates that the claimant may have undergone a period of psychological stress in 1999 (as well as prior), that was diagnosed by clinicians as a conversion disorder with a psychological basis." The report also notes, "Recent evidence, both medical and nonmedical, suggests that she has recovered sufficient functional capacity capable of at least full time light work."

Regarding your diagnosis of MS, [Dr. Holbrook] notes, ". . . consistent MRI abnormalities have been described that are consistent with but not diagnostic of MS.  In fact, over the prolonged period of observation by imaging, the claimant's MRI findings would be atypical of a presentation of MS."

Regarding your diagnosis of conversion disorder, the report states, "The claimant's diagnosed conversion disorder does not specifically exclude MS. However, the issue as to whether or not the claimant meets diagnostic criteria for MS is to a large degree irrelevant to the presence of impairment on the basis of this diagnosis."

The report continues, ". . . recent observations of the claimant's activities of daily living indicate that the claimant has regained sufficient functional capacity for at least full-time light work . . . in the claimant's most recent APS, dated 8/21/2002, Dr. O'Connor notes no physical restrictions; moreover, no impairment on a psychiatric basis is currently claimed by either the claimant or her physicians.  The Chiropractor, Dr. Baker, opined that the claimant had some physical limitations on the basis of a dislocation of a cervical vertebrae, dislocation of lumbar vertebrae and multiple sclerosis.  However, evidence is lacking for significant cervical or lumbar dislocation; the evidence for multiple sclerosis is not conclusive."  [Dr. Holbrook] also notes, "Given the fact that the majority of the claimant's symptoms are either self-reported, unwitnessed, or unable to be objectively validated, it is reasonable to use the evidence of surveillance as an estimate of the claimant's physical functional capacity, and to conclude that she does retain functional capacity sufficient for full time work."

D164-66.

### G.  April 30, 2004 – August 17, 2004:  Appeal to Liberty and Liberty's Denial

On April 30, 2004, Ms. Tsoulas appealed the termination of long-term disability benefits to Liberty.  D142-48.  She attached new material to bolster her claim of disability.  Exhibit A was an April 16, 2004 letter from Dr. Baker, stating that she had observed "Ms. Tsoulas experience a more ataxic gait as well as being on the threshold of a seizure activity."  D149.  Dr. Baker wrote that she had observed Ms. Tsoulas "when her speech was slurred" and when she was shaking uncontrollably.  *Id.*  Exhibit B was an April 23, 2004 letter from K. Sawyer, the program coordinator for the Maine Chapter Outreach office of the National Multiple Sclerosis Society.  D151-52.  Ms. Sawyer outlined some observations of Ms. Tsoulas, including "staggering and bumping against walls due to poor balance . . . fatigue, numbness, depression, seizures, stiffness, and pain."  *Id.*  Exhibit C was an August 22, 2003  MRI, which showed increased demyelination consistent with multiple sclerosis.  D153.  Exhibit D was a March 20, 2004 statement by Dr. Baker authorizing Ms. Tsoulas to reapply for a handicap placard.  D154-55.  The authorization notes that Ms. Tsoulas could not walk two hundred feet without stopping to rest or any distance without assistance, such as a brace, cane, crutch, another person, or wheelchair.  D154.  Exhibit E was an Expanded Disability Status Scale printout from the Multiple Sclerosis website.  D156-58.  The printout illustrated the ambulatory assistance required by persons rated 6.0 on the Kurtzke Expanded Disability Status Scale.[7]  Finally, Exhibit F was a copy of a printout from abcnews.com stating that one of the most debilitating symptoms of MS is fatigue.  D159-61.  The printout noted that "[f]atigue affects up to 87 percent of people with MS, and about 40 percent say it is their most debilitating symptom."  D159.

---

[7] The Kurtzke Expanded Disability Status Scale (KEDSS) is a way of quantifying disability in multiple sclerosis. http://www.multi-sclerosis.org/expandeddisabilitystatusscale.html.   "The KEDDS quantifies disability in eight functional systems," pyramidal, cerebellar, brainstem, sensory, bowel and bladder, visual, cerebral, and other, "and allows neurologists to assign a functional system score in each of these."  *Id.*

Ms. Tsoulas later supplemented the administrative record.  These materials included: (1) a January 29, 2004 prescription for a scooter, D126-29; (2) an April 29, 2004 letter from William Almodovar, Jr., Ms. Tsoulas's boyfriend, describing her fatigue and ambulatory difficulties, D118-19; (3) a May 3, 2004 letter from Joanne Grace, the producer of the Gracefully Yours calendar, describing her observations of Ms. Tsoulas's decline in health over the past three years and explaining that she was late for a calendar signing event and unable to go out with the other participants after the event due to fatigue, D122-23; (4) an April 27, 2004 letter from Donna Labree, RN, a nurse and a private investigator, describing her observations of Ms. Tsoulas's activities and the progression of her disability over the past two and one-half years, D124-25; and (5) a June 22, 2004 report of a neurological consultation with Dr. T. Edward Collins, D108-10.[8]

Liberty sent Dr. Holbrook the August 22, 2003 MRI and the April 16, 2004 Dr. Baker report.  D141, D143, D153.  Dr. Holbrook concluded neither report changed his March 27, 2004 opinions.  D139-40.  Liberty then sent Ms. Tsoulas's file, including supplemental materials, to Medical Consult Services, Incorporated, for a second independent peer review on August 5, 2004.  D34, D104.[9]

Dr. Eric Erlbaum, a board certified neurologist, reviewed her file and prepared an August 9, 2004 report, which he supplemented on August 25, 2004, after reviewing the surveillance videos. D78-88.  Dr. Erlbaum's responses to Liberty's questions were:

   1.  *Based on the objective findings, what is the diagnosis primary/secondary?*

---

[8] Dr. Collins's neurological examination of Ms. Tsoulas showed a "woman who appears outwardly well," but walked with a "'Frankenstein' type gait, rather stiff-legged with heavy foot placement."  D109-10.  While Dr. Collins found Ms. Tsoulas's manual muscle strength "almost normal," he reported significant giveaway weakness in her right upper extremity.  D110.  Dr. Collins concluded that Ms. Tsoulas "appears to have a severe disability".  *Id.*
[9] Ms. Tsoulas contends that Liberty failed to share certain critical information with Dr. Erlbaum, including the supplemental materials, Dr. Baker's notes from 2001 onward, and her employer's job description.  *Mem. of Law in Opp'n. to Def.'s Mot. for J. on the Admin. R.*  at 21 (Docket # 12).  This Court discusses this issue infra in § III(A)(2).

It appears to me that the primary diagnosis is most likely psychiatric in nature and from the records both somata form and/or depressive and anxiety issues.  The second diagnosis is a mild form of multiple sclerosis.

2. *What functional limitations and restrictions are present as a result of her physical condition as documented by the medical evidence?*

Her physical condition appears to play a very small role, if any, in limiting her physical capacity.  There does not appear to be any limitation based on the film.

3. *Review the surveillance video and advise if it lends any support to the work capacity?*

The surveillance video by itself would suggest that the claimant is available for full time work of her choosing.

4. *Based on the restrictions noted above, would the claimant be capable of performing sedentary or light work?*

Yes.

5. *If currently totally disabled from any work, what is the objective basis for restricting her?*

She is not totally disabled from any work.

D78, D86-88.

Dr. Erlbaum also discussed his review of the surveillance videos.  D78.

The claimant was seen getting in and out of the car with ease, driving her car without any difficulty, and walking down the street with maybe a marginal limp at the worst.  The claimant could also walk up and down a few steps without any difficulty.  There was also noted a normal arm swing.

Review of the video in my eyes would be similar to the description outline of the video.

On the basis of reviewing the video by itself, there is [sic] no overt signs of neurological disturbance seen. [10]

---

[10] In his initial report, Dr. Erlbaum wrote:  "Although I did not have the opportunity to review video recordings, I had the opportunity to review the interpretation of these performed by Buyer's Confidential Investigations.  These would strongly suggest that the subjective symptoms far outweigh the objective findings."  D88.

*Id.*

On August 17, 2004, Liberty wrote Ms. Tsoulas's attorney, denying her appeal of its termination of long-term disability benefits.  D89-91.  In the letter, Liberty reported that Dr. Erlbaum, while not a psychiatrist, noted that Ms. Tsoulas may have significant psychiatric issues. D90.  It pointed out that Ms. Tsoulas had not presented any psychiatric medical record and, without a record, Liberty was unable to determine whether she had a psychiatric impairment preventing her "from performing her own occupation as an Education/Training Manager."  *Id.* Liberty noted that Ms. Tsoulas was not claiming disability based on a psychiatric impairment; thus, its review on appeal focused on Ms. Tsoulas's documented physical condition.  *Id.*  On October 12, 2004, Ms. Tsoulas filed suit in Maine Superior Court, Penobscot County.  *See Compl.*  (Docket # 1, Attach. #1).

## II.    LEGAL STANDARD

Courts review benefits decisions by plan administrators and fiduciaries de novo, unless the benefits plan grants the administrator or fiduciary discretion to make benefits decisions. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Terry v. Bayer Corp.*, 145 F.3d 28, 37 (1st Cir. 1998).  Where, as here,[11] a plan fiduciary has the discretion to determine eligibility for and entitlement to benefits, the district court must uphold the fiduciary's decision "'unless it is arbitrary, capricious, or an abuse of discretion.'"  *Buffonge v. Prudential Ins. Co. of Am.,* No. 05-1416, 2005 U.S. App. LEXIS 22197 at * 20 (1st Cir. Oct. 14, 2005); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 125 (1st Cir. 2004) (quoting *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 212-13 (1st Cir. 2004)).  Liberty's decision will be upheld under this standard so long as the termination is both reasonable and supported by substantial evidence.  *Id.* at 126; *see*

---

[11] The General Provisions of the contract for insurance provides:  "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder."  D24.

*also Leahy v. Raytheon Co*., 315 F.3d 11, 17 (1st Cir. 2002) ("The arbitrary and capricious standard asks only whether a factfinder's decision is plausible in light of the record as a whole . . . ."). "Substantial evidence" means evidence reasonably sufficient to support a conclusion. *Doyle v. Paul Revere Life Ins. Co*., 144 F.3d 181, 184 (1st Cir. 1998). Sufficient evidence is not nullified by the mere existence of contradictory evidence. *Id.*; *see also Gannon*, 360 F.3d at 213 ("[T]he existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."). It is the responsibility of the plan fiduciary to weigh conflicting evidence. *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 32 (1st Cir. 2001). The issue is "'not which side [the Court] believe[s] is right, but whether [the insurer] had substantial evidentiary grounds for a reasonable decision in its favor.'" *Brigham v. Sun Life of Can*., 317 F.3d 72, 85 (1st Cir. 2003) (quoting *Doyle*, 144 F.3d at 184).

## III.   DISCUSSION

### A.  Conflict of Interest

Applying the arbitrary and capricious standard, the "existence of a conflict of interest on the part of the administrator is a factor that must be considered." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) (citing *Bruch*, 489 U.S. at 115). In the First Circuit, "if a court concludes there is an improper motivation amounting to a conflict of interest, the court 'may cede a diminished degree of deference – or no deference at all – to the administrator's determinations.'" *Id.* (quoting *Leahy*, 315 F.3d at 16). "However, '[a] chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due.'"[12] *Id.* Where no obvious conflict of interest exists, "a court must proceed to ensure that the decision was not objectively unreasonable in light of the

---

[12] The burden is on the claimant to demonstrate a conflict of interest. *See Wright*, 402 F.3d at 74 n.4; *Pari-Fasano v. ITT Hartford Life and Accident Ins. Co.*, 230 F.3d 415, 418 (1st Cir. 2000).

available evidence, recognizing that the existence of a potential conflict of interest will affect the court's determination of what was reasonable conduct by the insurer under the circumstances." *Id.* (citing *Pari-Fasano*, 230 F.3d at 418). Here, there is no dispute that the policy confers discretion on Liberty, but the parties disagree whether Liberty labored under a conflict of interest. Ms. Tsoulas argues that Liberty had a conflict of interest, as evidenced by (1) its dual status as payor of benefits and fiduciary with respect to the long-term disability benefits; and, (2) other factors she claims reflect "improper motivation".

### 1. Conflict Based on Status

Ms. Tsoulas contends that because Liberty is both insurer and fiduciary, "there is an inherent conflict of interest in the Defendant's decisionmaking process when a finding of eligibility means that Defendant will have to pay benefits out of its own pocket." *Mem. of Law in Opp'n. to Def.'s Mot. for J. on the Admin. R.* at 2 (Docket # 12). Under First Circuit law, however, "[t]he fact that . . . the plan administrator will have to pay [the] claim out of its own assets does not change [the arbitrary and capricious] standard of review." *Glista*, 378 F.3d at 125-26 (if the plan grants discretion, an administrator may exercise it even though it has to pay the claim); *see also Wright*, 402 F.3d at 75; *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir. 1999); *Doyle*, 144 F.3d at 184. In *Pari-Fasano*, the First Circuit recognized that an insurer "does have a conflict of sorts when a finding of eligibility means that the insurer will have to pay benefits out of its own pocket," but determined that "the market presents competing incentives to the insurer that substantially minimize the apparent conflict." 230 F.3d at 418. In *Doyle*, the First Circuit discussed the competing incentives, stating that because the purpose of benefits plans is to please employees, "an employer would not want to keep an overly tight-fisted insurer." 144 F.3d at 184. Thus, an insurer could "hardly sell policies if it is too severe in

20

administering them."   *Doe*, 167 F.3d at 57.   Mindful of First Circuit precedent, this Court declines to apply a less deferential standard due to the alleged structural conflict and concludes Liberty does not have a conflict based on status in this case. *See Wright*, 402 F.3d at 75 (noting that the district court "properly declined to apply a less deferential standard due to the . . . structural conflict" alleged by the claimant).

### 2. Conflict Based on Improper Motivation

Ms. Tsoulas argues that Liberty labored under a conflict of interest because its determination to terminate her benefits was improperly motivated or biased.   Ms. Tsoulas appears to advance the following allegations of improper motivation:   (1) Liberty was biased against Ms. Tsoulas's claim because it initiated surveillance without information pointing to a change in her medical condition, *Mem. of Law in Opp'n. to Def.'s Mot. for J. on the Admin. R.* at 4-5; (2) to justify surveillance, Liberty focused on "largely irrelevant" information, such as a newspaper photograph depicting her standing unaided in an advertisement for the MS Society and her authorship of an article regarding naturopathic products, *Id.* at 5; (3) Liberty recited alleged difficulties its claim examiners had obtaining Ms. Tsoulas's cooperation "to sway the court's opinion based on irrelevant details of the history of Ms. Tsoulas's claim," *Id.* at 8 n.3; (4) Dr. Holbrook "appears to have placed undue weight on the existence of a conversion disorder diagnosis," *Id.* at 17; (5) Dr. Holbrook unreasonably relied on a medical report from Ms. Tsoulas's oncologist,[13] *Id.*; (6) it "does not appear from the record that Dr. Holbrook actually reviewed the footage of the surveillance as opposed to merely the report"; *Id.* at 17-18; (7) Dr. Holbrook "makes no analysis of Plaintiff's memory and cognitive difficulties…." *Id.* at 18; (8) Liberty failed to "engage in any substantive review of the evidence submitted by Plaintiff's counsel," *Id.* at 21; (9) Liberty did not share most of the additional materials submitted with Dr.

---

[13] *See* footnote 6 *supra*. Ms. Tsoulas's argument does not depend upon Dr. O'Connor's specialty.

Erlbaum, *Id.*; (10) Dr. Erlbaum failed to review the notes of Ms. Tsoulas's chiropractor, Dr. Baker, *Id.*; (11) Dr. Erlbaum "apparently discounted Plaintiff's MS diagnosis because she has declined traditional MS treatment," *Id.*; (12) Dr. Erlbaum "utterly fails to consider Plaintiff's extreme fatigue or memory and cognitive deficits in arriving at his conclusions," *Id.* at 22; and, (13) Liberty's claims reviewer did not consider the additional materials submitted by Ms. Tsoulas in connection with her appeal. *Id.* at 23 n.15.

Ms. Tsoulas's contention of improper motivation and bias is without merit. Regarding her argument that Liberty initiated surveillance to terminate her benefits, it is her incorrect premise that Liberty initiated surveillance to disprove her claim. It is equally, if not more likely, however, that Liberty initiated surveillance to objectively document whatever her activity level turned out to be. If the surveillance revealed information inconsistent with her stated complaints, the surveillance could be used as evidence to terminate her benefits; however, if the surveillance demonstrated limitations consistent with her complaints, it would have supported, not undercut her claim of benefits.

Liberty's claim file contains references to the need to obtain objective evidence of Ms. Tsoulas's functional limitations. *See, e.g.,* D66 (noting need for both medical and nonmedical data to confirm Ms. Tsoulas's limitations); D70 (leaving Ms. Tsoulas's claim open while obtaining further information); D63 (recommending the collection of further medical and nonmedical information to confirm Ms. Tsoulas's restricted capacity); D720 ("I would also say in order to confirm all the information she has provided as well as what we have received, the surveillance idea might not be bad. This should either confirm or call into question further investigation into the situation."). The evidence does not support Ms. Tsoulas's argument that Liberty initiated surveillance in order to terminate her benefits.

Ms. Tsoulas's remaining allegations find no record support.[14]   Ms. Tsoulas contends Liberty failed to supply Dr. Erlbaum with her supplemental information.   She asserts that with the exception of Dr. Collins's report, Dr. Erlbaum did not mention this information. *Mem. of Law in Opp'n. to Def.'s Mot. for J. on the Admin. R.* at 21.   This is in part factually incorrect.   Dr. Erlbaum mentions not only Dr. Collins's report, but also the August 2003 Repeat MRI.   D85 ("Repeat MRI scan of the brain in August 2003 showed increased signal intensity in the paraventricular white matter.").   Thus, Dr. Erlbaum's report mentions the two medical reports that Ms. Tsoulas submitted by supplementation.[15]   Further, the record contains evidence from which it can be inferred that Liberty sent Dr. Erlbaum Ms. Tsoulas's entire file, including her supplemental materials.   *See* D34 (noting that Ms. Tsoulas's attorney had submitted additional information and the "file has been copied [and] sent . . . for a neurologist peer review.").   Since the record confirms Liberty copied "the file" and since Dr. Erlbaum received some of the supplemental material, this Court makes the inference that Liberty sent the entire file, absent any direct evidence to the contrary.[16]   D86.

Ms. Tsoulas's contention that Liberty failed to review the supplemental materials is also unsupported.   The record illustrates that Liberty extended the appeal deadline on multiple occasions to permit Ms. Tsoulas to submit additional information, and that Liberty considered the supplemental information provided.   *See* D33-34 (extending appeal deadline and noting that "[t]o date [Ms. Tsoulas's attorney has] forwarded one medical report and several letters from

---

[14] Dr. Holbrook's alleged bias is discussed in § III(C).

[15] The other supplementary material included material from Ms. Tsoulas's boyfriend, from K. Sawyer, the Program Coordinator of the MS Society, from Jane Grace, the producer of the Gratefully Yours calendar, from Donna LaBree, a nurse and private investigator, from the MS website, from abcnews.com, and from Dr. Baker, a chiropractor.   Dr. Erlbaum does not itemize these additional materials; however, he may not have considered this non-medical supplemental information significant for purposes of performing a medical records review.

[16] To rule otherwise would require the Court to assume that unless the medical report lists each item the examiner reviewed, he or she did not review it.   It is at least as likely that the doctor listed only those materials he concluded were medically significant.   The burden to demonstrate evidence of a conflict of interest rests with Ms. Tsoulas.   *See footnote* 12 *supra*.

various persons describing the clmt's physical impairments caused by MS."). Moreover, all information presented by Ms. Tsoulas is part of the record reviewed at the administrative level. D116-29; D142-48. The record does not support Ms. Tsoulas's allegations of Liberty's improper motivation, amounting to a conflict of interest. *See Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan,* 402 F.3d 67, 77 (1st Cir. 2005).

**B. Own Occupation**

The policy defines "disability" or "disabled," as follows:

a. If the Covered Person is eligible for the Maximum Own Occupation Benefit, **"Disability"** or **"Disabled"** means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period he is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness.

D6. For Ms. Tsoulas to prevail, she must demonstrate the administrative record, as it existed at the time of Liberty's decision to terminate benefits, contains evidence that demonstrates her inability to perform the essential duties of her "own occupation."

Ms. Tsoulas asserts that, in defining "own occupation," Liberty unreasonably relied primarily on a Department of Labor definition of manager of educational services from the Dictionary of Occupational Titles ("DOT").[17] Ms. Tsoulas posits that Liberty should have acquired a more accurate job description from Medaphis and conducted further investigation regarding the requirements of a manager of educational services.[18]

---

[17] The DOT is the result of over fifty years of occupational data collection and evaluation for the very purpose of defining specific "occupations." *Dionida v. Reliance Standard Life Ins. Co*., 50 F. Supp. 2d 934, 940 n.4 (N.D. Cal. 1999). The DOT groups various jobs into "occupations" based on their similarities, and therefore an "occupation" in the DOT covers more than one particular job. *Id.* The DOT is widely and routinely used to define "occupations in the United States economy." *Id.*

[18] Plaintiff contends that Liberty erred in concluding she was able to perform her "own occupation" even on the basis of the DOT description. Among other things, Plaintiff argues that "Defendant failed to recognize that the job could include walking and standing frequently, as well as lifting up to 20 pounds." *Mem. of Law in Opp'n. to Def.'s Mot. for J. on the Admin. R.* at 19. However, the DOT description classifies the frequency with which a manager of educational services must stand as "[s]ometimes" and walk as "[a]lmost [n]ever." D176. In Ms. Tsoulas's August 20, 2002, Functional Capacities Form (FCF), Dr. Baker reported that Ms. Tsoulas retained the capacity to lift

The DOT describes the position of "Manager, Education and Training" as requiring light work, including occasional lifting, carrying, pushing, and pulling, and constant talking.  D172. Liberty made one unsuccessful attempt to reach Medaphis to establish the occupational requirements of an educational services manager. D37.  Based on the medical records, reports, and video surveillance, Liberty determined that Ms. Tsoulas was not prevented from performing her own occupation as described by the DOT and, therefore, no longer met the policy's definition of disability.  D35, D163-167.

The Liberty policy contains no definition of "own occupation."  When the term "occupation" is undefined, courts properly defer to the DOT definition of the term because insurers issuing disability policies "cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation." *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F. Supp. 2d 1253, 1259 (D. Nev. 2000), *remanded on other grounds*, 33 Fed. Appx. 908, 910 (9th Cir. 2002) ("[W]e agree with the district court that Standard did not abuse its discretion in interpreting 'own occupation' to mean the insured's occupation as defined generally by the Department of Labor rather than the insured's specific job."); *see also Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 272-73 (4th Cir. 2002) (upholding reliance on DOT as "objectively reasonable" in ERISA action and noting that "[a] general job description of the DOT, to be applicable, must involve comparable duties but not necessarily every duty"); *Dionida v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 2d 934, 939-40 n.4 (N.D. Cal. 1999) (noting that the DOT is "widely and routinely used to define 'occupations' in the U.S. economy" and that it is "reasonable for plan [fiduciaries], and courts to use it" in making disability determinations under ERISA).

---

between ten and twenty pounds "frequently."  D345.  "Frequently," for purposes of the FCF, means one-third to two-thirds of an eight-hour work day.  *Id.*

Courts have applied the term, "own occupation," generally and have evaluated disability in light of the usual duties of that occupation, not on ad hoc peculiarities of a specific job or the requirements of a particular employer who may require activities beyond that generally contemplated by the "occupation." *Ehrensaft*, 120 F. Supp. 2d at 1259; *see also Panther v. Synthes (U.S.A.),* 371 F. Supp. 2d 1267, 1276-77 (D. Kan. 2005) (Sun Life properly defined "own occupation" to mean one's occupation as it is performed routinely in the labor market, rather than how a particular employee performed his or her job for a particular employer); *Richards v. Hartford Life & Accident Ins. Co.*, 356 F. Supp. 2d 1278, 1286 (S.D. Fla. 2004) (administrator may interpret "Your Occupation" language in policy to mean plaintiff's job in the general workplace as opposed to her specific workplace); *Ceasar v. Hartford Life & Accident Ins. Co.,* 947 F. Supp. 204, 207-08 (D.S.C. 1996) (insurer did not abuse its discretion when it determined that the plaintiff could perform his "own occupation" as it existed in the national economy, as opposed to his particular job which required rotating shift requirements); *Hanser v. Ralston Purina Co.,* 821 F. Supp. 473, 478 (E.D. Mich. 1993) (under an arbitrary and capricious standard, "that defendant's interpretation of the terms 'regular occupation' as meaning the type of work which a covered employee is trained to perform rather than the specific job at which the employee was working . . . is a rational interpretation supported by the plain meaning of the words.").[19]

---

[19] A number of cases dispute the propriety of deferring to the DOT to determine the material duties of claimants' occupations.  *See Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 386 (3d Cir. 2003); *Shahpazian v. Reliance Standard Life Ins. Co.*, No. 03-CV-2932-WSD, 2005 WL 2375076, at *8 (N.D. Ga. Sep. 27, 2005); *Wirries v. Reliance Standard Ins. Co.*, No. CV-01-565-E-MHW, 2005 WL 2138682, slip op. at *6 (D. Idaho Sep. 1, 2005); *Smith v. Reliance Standard Life Ins. Co.*, 350 F. Supp. 2d 993, 999 (S.D. Fla. 2004); *Freling v. Reliance Standard Life Ins. Co.*, 315 F. Supp. 2d 1277, 1291 (S.D. Fla. 2004); *Greene v. Reliance Standard Life Ins. Co.*, No. 03-CV-00025, 2004 WL 2634416, at *2 (W.D. Va. Oct. 26, 2004) (unpublished opinion); *Conrad v. Reliance Standard Life Ins. Co.*, 292 F. Supp. 2d 233, 240-41 (D. Mass. 2003); *Ransom v. Unum Life Ins. Co. of Am.*, 250 F. Supp. 2d 649, 657 (E.D. Va. 2003); *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 735 (S.D. Ohio 2001).

Notwithstanding this authority, Liberty was reasonable in relying on the DOT description of a manager of educational services in this instance.  Notably, many cases involved plaintiffs who gave concrete examples of tasks

This Court concludes that Liberty did not err in deferring to the DOT definition of manager of educational services, rather than obtaining Medaphis's description of Ms. Tsoulas's particular job requirements, to determine whether she was disabled from performing her "own occupation."

## C.   The Arbitrary and Capricious Standard

Within its limited scope of review, this Court cannot dissect the medical history, video surveillance and physicians' reports.   The question is not whether this Court agrees with Liberty's interpretation, but whether there is "substantial evidence" to support Liberty's conclusion.   Liberty points to the surveillance, the reports of Drs. Holbrook and Erlbaum, Ms. Tsoulas's own medical records, and the purported contradiction between her self-reported limitations and the record as the bases for its conclusion that she is able to perform her own occupation as an education manager.

### 1.   The Surveillance and the Questionnaire

Ms. Tsoulas's February 12, 2004, Activities Questionnaire paints a picture of a severely disabled individual who sleeps fourteen to eighteen hours per day, cannot walk without assistive devices, has difficulty standing, never shops at the mall, cannot shop for groceries on her own, and cannot ascend stairs.   The surveillance, however, contains probative evidence, which is difficult to reconcile entirely with the Questionnaire.   The surveillance shows Ms. Tsoulas driving her car unassisted, patronizing tanning salons, banks, restaurants, clubs, and shops, walking up and down small flights of stairs, shopping at malls and video stores, shopping at

---

required by their actual jobs which differed substantially from the DOT descriptions. *See, e.g., Ebert*, 171 F. Supp. 2d at 734-35; *Greene*, 2004 WL 2634416, at *2.  Ms. Tsoulas has not provided any divergent duties here.  Under First Circuit law, the claimant has the burden of proving the requirements of her job and showing which duties she is incapable of performing. *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 77 (1st. Cir. 2005) ("It was Wright's burden to provide evidence that he was unable to perform the duties of his occupation.  An integral part of that evidence would be a statement of what his job required.") (citation omitted). *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264 (4th Cir. 2002).

grocery stores, pushing shopping carts, loading and unloading groceries, and walking without the aid of a cane, wheelchair, or scooter.[20]

### 2.  Surveillance and the DOT Job Description

Based in part on the surveillance, Liberty could rationally conclude that Ms. Tsoulas's actual physical abilities contradicted her claimed physical limitations and largely comport with the DOT's description of the physical requirements of her occupation.  The DOT job description establishes that the education manager position involves light or sedentary work, including conferring with management to determine training needs, compiling data, using a computer, formulating policies and schedules, designating training procedures, organizing and developing manuals and procedures, training subordinates and updating records.  The job description also reflects that the physical requirements for the position include light duty work and constant reaching, handling, talking, hearing and visual acuity.  Furthermore, the DOT description of an education manager states that communicating, oral expression, and oral comprehension are the most important parts of the job; written expression, writing comprehension, problem sensitivity, near vision, and information ordering are also important; light duty manipulations are somewhat important; and manual dexterity, multi-limb coordination, physical strength, and other "gross body" manipulations are not at all important.  Finally, the job description establishes that

---

[20] Ms. Tsoulas argues vehemently that the video footage corroborates rather than undermines her claimed inability to perform "all of the material and substantial duties of her occupation on a full-time basis."  For example, she contends that on March 14, 2004, the video footage shows her "walking slowly, . . . limping and holding her boyfriend's arm or hand."  *Mem. of Law in Opp'n. to Def.'s Mot. for J. on Admin. R.* at 13-14.  This Court has viewed the videotape surveillance.  It is true that the video depicts Ms. Tsoulas with a stiff-legged gait, but it is also true the surveillance shows her performing a wide range of activity inconsistent with her stated limitations. Although the surveillance is subject to different interpretations, it is not this Court's duty, under the arbitrary and capricious standard, to determine which interpretation is more plausible.  Rather, the question is whether the footage, in combination with other evidence, supports the conclusion that Liberty's termination of Ms. Tsoulas's long-term disability benefits was not "'arbitrary, capricious, or an abuse of discretion.'"  *See Glista*, 378 F.3d at 125 (quoting *Gannon*, 369 F.3d at 212-13).

climbing, walking, running, kneeling, stooping, balancing, bending, and making repetitive motions are "almost never" required.[21]

The surveillance, when used in conjunction with Ms. Tsoulas's answers in the Questionnaire and compared with the DOT job description, provided "reasoned support for its conclusions." *Buffonge*, at * 26.

### 3. The Medical Record

The surveillance material was not the only evidence upon which Liberty based its decision. After the surveillance, Dr. John Holbrook, a medical consultant to Liberty, reviewed her claim and file. In his March 27, 2004 report, Dr. Holbrook concluded that Ms. Tsoulas's diagnosis of MS had not been conclusively established, and the information in her file, including her medical history and the surveillance materials, suggested she had recovered sufficient functional capacity to resume full-time light work.

Following Ms. Tsoulas's appeal, Liberty sought a second opinion regarding her claimed disability from Dr. Erlbaum, a board certified neurologist. Dr. Erlbaum concluded her primary diagnosis was likely psychiatric in nature and her secondary diagnosis was a mild form of MS. Dr. Erlbaum also determined, based on a review of her medical history and the video surveillance, that Ms. Tsoulas was capable of performing full-time work.

This Court cannot say that Liberty erred in relying in part on the findings of independent reviewing physicians such as Drs. Holbrook and Erlbaum. *See Gannon*, 360 F.3d at 214 (physician's independent review of a claimant's file is reliable medical evidence to support

---

[21] This case is similar to *Onofrieti v. Metropolitan Life Ins. Co.*, 320 F. Supp. 2d 1250 (M.D. Fla. 2004). *Onofrieti* reviewed an administrator's denial of long-term disability benefits to a plaintiff whose doctors reported that she was unable to work based on self-reported symptoms caused by fibromyalgia, a neurological condition. Ms. Onofrieti, like Ms. Tsoulas, submitted an activities form depicting her physical activities as severely limited. *Id.* at 1252. Surveillance, however, contradicted her self-reported limitations. *Id.* The administrator's medical consultant reviewed the videos together with the medical records and concluded that it would be difficult to substantiate her inability to work. *Id.* Applying a stricter standard of review, *Onofrieti* upheld the denial of benefits. *Id.* at 1254.

denial of benefits even though he did not physically examine claimant); *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998) (administrator entitled to rely on physician's independent review of claimant's medical file); *Kocsis v. Standard Ins. Co.*, 142 F. Supp. 2d 241, 252-53 (D. Conn. 2001) (summary judgment appropriate based on two physicians' independent reviews of the plaintiff's entire claim file).

Neither Dr. Holbrook nor Dr. Erlbaum concluded Ms. Tsoulas's condition prevented her from performing the substantial duties of her occupation.  There is  probative evidence in the form of surveillance, medical reports, and Ms. Tsoulas's own  medical history that her MS was mild and not totally disabling under the terms of the policy.  The existence of contradictory evidence, such as Ms. Tsoulas's complaints of tremors, fatigue, slurred or stuttering speech, and ataxia noted in Dr. Langer's July 19, 2002 History, Physical Examination and Progress Record (D396-99), does not necessarily mean that Liberty's decision is arbitrary and capricious and unsupported by substantial evidence.  Based on the evidence in this record and mindful of its limited role, this Court concludes Liberty's termination of long-term disability benefits was supported by substantial evidence and must be sustained.  *See Jestings v. New England Te. & Tel. Co.*, 757 F.2d 8, 9 (1st Cir. 1985); *Johnson v. UNUM Life Ins. Co. of Am.*, 329 F. Supp. 2d 161, 169 (D. Me. 2004); *Guarino v. Metro. Life Ins. Co.*, 915 F. Supp. 435, 445 (D. Mass. 1995). The independent medical evaluations, when combined with other information in the record, provided Liberty with "reasoned support for its conclusion."  *Buffonge,* at * 27.

### D.  Bias of Dr. Holbrook

Finally, Ms. Tsoulas contends that Dr. Holbrook was biased due to the following:  (1) he "placed undue weight on the existence of a conversion disorder diagnosis in 1998 and 1999" in concluding the diagnosis of MS was not conclusively established; (2) he unreasonably relied on

Dr. O'Connor's opinion that Ms. Tsoulas had no physical restrictions because Dr. O'Connor was an oncologist and did not treat Ms. Tsoulas for MS; (3) Dr. Holbrook did not review the actual footage of the surveillance, and unreasonably relied on the surveillance reports in concluding that Ms. Tsoulas's physical capabilities were greater than she reported; and, (4) Dr. Holbrook did not consider Ms. Tsoulas's memory, speech and cognitive impairments in concluding that she was able to perform the material duties of her occupation.  Because of these alleged deficiencies, Ms. Tsoulas claims that it was unreasonable for Liberty to rely on Dr. Holbrook's report in terminating her benefits.  *Mem. of Law in Opp'n. to Def.'s Mot. for J. on the Admin. R.* at 16-18.

Liberty provided Dr. Holbrook with all of the medical records presented by Ms. Tsoulas, including her most recent records.  Moreover, Liberty specifically requested that Dr. Holbrook review the surveillance footage, D179, and Dr. Holbrook in his report noted that he considered the surveillance and compared it to Ms. Tsoulas's self-reported limitations.  D181.  The fact that Dr. Holbrook's report may have accorded more weight to some pieces of evidence than others does not detract from its reliability.  *See Gannon*, 360 F.3d at 214 ("Indeed, it is not for a court to determine how much weight [an independent medical examiner] should . . . accord[]" a particular piece of evidence, "nor is it for a court to determine precisely how much weight [the plan fiduciary] should . . . accord[] [an independent medical examiner's] opinion in its overall decision").  Simply put, there is a lack of evidence of any bias on the part of Dr. Holbrook and this Court concludes that Liberty reasonably relied on his report as one piece of evidence in support of its decision to terminate Ms. Tsoulas's benefits.

IV.     **CONCLUSION**[22]

This Court GRANTS the Defendant's Motion for Judgment on Stipulated Record (Docket No. 10).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of October, 2005

---

[22] In light of the disposition of this case, this Court need not address Ms. Tsoulas's request for attorney fees and costs.